OLIVER Q. DUNLAP (CA Bar No. 225566)
KING & SPALDING LLP
101 Second St., Suite 2300
San Francisco, CA 94105
E-mail: odunlap@kslaw.com
Telephone: (415) 318-1271
Facsimile: (415) 318-1300

*Of Counsel*
MICHAEL J. CIATTI
PATRICIA L. MAHER
KING & SPALDING LLP
1700 Pennsylvania Ave., N.W.
Washington, D.C. 20006-4706
E-mail: mciatti@kslaw.com
E-mail: pmaher@kslaw.com
Telephone:  (202) 737-0500
Facsimile:  (202) 626-3737

Attorneys for Defendant
BANK OF AMERICA, N.A.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

**KINSELL, NEWCOMB & DE DIOS, INC.,**

**Plaintiff,**

v.

**BANK OF AMERICA, N.A., et al.,**

**Defendants.**

**Case No. 3:11-cv-00994-JAH-WMC**

**TABLE OF CONTENTS: DECLARATION OF MICHAEL J. CIATTI**

## TABLE OF CONTENTS

**Exhibit 1:**     pages 1 - 22;

**Exhibit 2:**     pages 23 - 26.

# Exhibit 1 - Ciatti Declaration

WATT, TIEDER, HOFFAR
& FITZGERALD, L.L.P.®

ATTORNEYS AT LAW



8405 Greensboro Drive
Suite 100
McLean, Virginia 22102-5104
Telephone: 703-749-1000
Facsimile: 703-893-8029
www.wthf.com

Alex Lamme. Esq.
Direct Dial: 703-749-3069
Facsimile: 703-893-8029

January 18, 2011

**Via U.S. Mail**

Edward P. O'Keefe, Esq.
General Counsel, Bank of America
Bank of America Legal Department
101 S. Tryon Street
Charlotte, North Carolina  28255

Jennifer R. Heath, Esq.
Assistant General Counsel, Bank of America
Bank of America Legal Department
101 S. Tryon Street
Charlotte, North Carolina  28255

Re:   **Request for Meeting Regarding Damage to KND Arising**
**from Bank of America's Fraudulent and Conspiratorial**
**Conduct**

Dear Mr. O'Keefe & Ms. Heath:

This firm represents Kinsell, Newcomb and De Dios, Inc. ("KND") with respect to a number of California school district advance refunding financing programs that began in the early 1990s.  As described in more detail below, and in the attached Complaint, the fraudulent bidding practices and informal (and illegal) kickback agreements between Bank of America, N.A. ("Bank of America") and CDR Financial, f/k/a Chambers, Dunhill, Rubin & Co. ("CDR") as it relates to some of these financing programs has resulted in significant financial damage to KND.  As such, and prior to filing the attached Complaint, KND believes that it is in both KND's and Bank of America's best interests to discuss an out-of-court resolution of the issues presented in KND's Complaint so as to avoid the cost and publicity concomitant to such a legal action.

Beginning in the early 1990s, KND participated in twenty-six (26) advance refunding programs with a number of California school districts.  As part of these advance refunding programs, and in order to mitigate an inefficiency in the market, an

Exhibit 1
Page 2

Edward P. O'Keefe, Esq.
Jennifer R. Heath, Esq.
Bank of America
January 18, 2011
Page 2

escrow agent would enter into an Escrow Reinvestment Agreement with an investment entity, such as Bank of America.  On twenty-four (24) occasions, CDR acted as the independent broker responsible for collecting bids for the Escrow Reinvestment Agreements.  Of the twenty-four (24) school district financings for which CDR was the independent broker, Bank of America won the right to enter into an Escrow Reinvestment Agreement with the escrow agent six (6) times.

Based on information obtained from inquiries by the Internal Revenue Service ("IRS") and the Securities and Exchange Commission ("SEC") during which the IRS and SEC indicated that Bank of America's and CDR's involvement in certain of the Escrow Reinvestment Agreements resulted in the initial scrutiny of the refunding program, as well as media coverage of Bank of America's and CDR's participation in a national bid-rigging conspiracy in the municipal bond market, KND learned that Bank of America and CDR used the Escrow Reinvestment Agreements as a vehicle to perpetrate a fraud on KND (and other interested parties in the refunding program) and to further their national bid-rigging conspiracy.  Specifically, it was suggested that in exchange for a "last look," Bank of America provided illegal kickbacks to CDR.   This illegal kickback was accomplished through a provision of the Escrow Reinvestment Agreement.  As part of this fraud, Bank of America falsely represented to KND (and other interested parties in the transaction) that it had not received any bidding advantage and that it's bid price was not based on any formal or informal agreement with any other party to the transaction.  CDR falsely certified that it did not receive funds in excess of $10,000.

As demonstrated by the recent guilty pleas of a number of former CDR and Bank of America employees to counts of fraud and conspiracy, Bank of America representations were materially false.   Indeed, these fraudulent misrepresentations were part of a much larger bid-rigging conspiracy between Bank of America and CDR.  This conclusion is undeniable in light of Bank of America's recent agreements with the SEC, the IRS, the Office of the Comptroller of Currency, and twenty (20) State Attorney Generals for payment of restitution to the IRS and to municipalities harmed by Bank of America's anticompetitive conduct in the municipal bond derivatives market.  As set forth in the attached Complaint, as a direct result of the fraud perpetrated by Bank of America and CDR, KND suffered damages in excess of $15 million, which damages are subject to trebling as a result of Bank of America's violation of the Racketeer Influenced and Corrupt Organizations Act.

In an effort to minimize any additional negative media coverage to Bank of America, and to comply with Bank of America's obligation to make full restitution to the victims of the conspiracy, KND believes that it is in both parties' best interest to seek an out-of-court resolution of the issues presented in KND's Complaint.  If KND does not hear from Bank of America by January 30, 2011, KND will assume that Bank of America

Exhibit 1
Page 3

Edward P. O'Keefe, Esq.
Jennifer R. Heath, Esq.
Bank of America
January 18, 2011
Page 3

does not wish to resolve these issues amicably, out-of-court and KND will file the attached Complaint.

I look forward to speaking with you regarding this issue.

Very truly yours,

WATT, TIEDER, HOFFAR
& FITZGERALD, LLP

Alexander N. Lamme

Encl.

cc:    Mr. Jeff Kinsell, Kinsell, Newcomb & De Dios, Inc.

1   Mark A. Sgarlata
    Alexander N. Lamme
2   David E. Nemeth, Jr.

3   Watt, Tieder, Hoffar & Fitzgerald, L.L.P.
    2040 Main Street, Suite 300
4   Irvine, California 92614
    Telephone:    949-852-6700
5   Facsimile:    949-261-0771

6   Attorneys for Plaintiff
    Kinsell, Newcomb & De Dios, Inc.

7

8                    SUPERIOR COURT OF CALIFORNIA

9                       COUNTY OF SAN DIEGO

10

11  KINSELL, NEWCOMB & DE DIOS,          Case No.
    INC., a California corporation,
12                                       UNLIMITED JURISDICTION
              Plaintiff,
13                                       **COMPLAINT FOR:**
         v.
14                                       **1. Fraud**
    BANK OF AMERICA, N.A, a national
15  bank organized and existing under and by   **2. Fraudulent Concealment**
    virtue of the laws of the United States of
16  America; and CDR FINANCIAL          **3. Tortious Interference with Prospective**
    PRODUCTS, INC., f/k/a CHAMBERS,         **Economic Advantage**
17  DUNHILL, RUBIN & CO., a California
    corporation.                        **4. Negligent Interference with Prospective**
18                                          **Economic Advantage**
              Defendants.
19                                       **5. Violation of the Racketeer Influenced and**
                                            **Corrupt Organizations Act ("RICO")**
20

21                                       Assigned for all purposes to:

22                                       Judge:
                                         Dept.:
23

24

25          Plaintiff Kinsell, Newcomb & De Dios, Inc., hereby alleges against Defendants Bank of

26  America, N.A. and CDR Financial Products, Inc., f/k/a Chambers, Dunhill, Rubin & Co., as

27  follows:

28

WATT, TIEDER,
HOFFAR &
FITZGERALD, L.L.P.
ATTORNEYS AT LAW
                                    COMPLAINT

Exhibit 1
Page 5

**THE PARTIES**

1.     Plaintiff Kinsell, Newcomb & De Dios, Inc. ("Plaintiff," or "KND") is, and was at all relevant times, a California corporation with its principal place of business located at 2776 Gateway Road, Carlsbad, California 92009.  KND is a Financial Industry Regulatory Authority ("FINRA") and Securities and Exchange Commission ("SEC") member investment banking firm that participated in twenty-six (26) advance refunding financing programs with a number of California school districts to refund the existing debt of such districts and to raise money for school related projects for these districts.

2.     Plaintiff is informed and believes, and on that basis alleges, that Defendant Bank of America, N.A. ("Bank of America") is, and was at all relevant times a national bank duly organized and existing under and by virtue of the laws of the United States of America with its main office located in Charlotte, North Carolina.  Plaintiff is informed and believes, and on that basis alleges, that Bank of America conducts substantial business in California, including in San Diego County, California.  Bank of America participated in six (6) of the twenty-six (26) advance refunding programs as a party to the Escrow Reinvestment Agreement (defined below).

3.     Plaintiff is informed and believes, and on that basis alleges, that Defendant CDR Financial Products, Inc., f/k/a Chambers, Dunhill, Rubin & Co. ("CDR") was at all relevant times, a California corporation with its principal place of business located at 9777 Wilshire Blvd., Beverly Hills, California 90212.  CDR participated in twenty-four (24) of the twenty-six (26) advance refunding programs as an independent broker that collected the bids for the Escrow Reinvestment Agreements.

**JURISDICTION**

4.     The Superior Court of California has concurrent jurisdiction over a civil action for damages authorized by the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. 1964(c).  Tafflin v. Levitt, 493 U.S. 455, 466-67 (1990); Cianci v. Superior Court, 40 Cal.3d 903, 908-16 (1985).

**GENERAL ALLEGATIONS**

5.     Beginning in the early 1990s, KND participated in a financing program for a

- 2 -

COMPLAINT

WATT, TIEDER,
HOFFAR &
FITZGERALD, L.L.P.
ATTORNEYS AT LAW

Exhibit 1
Page 6

1    number of California school districts whereby a municipal issuer (the school district) with

2    outstanding tax-exempt bonds would authorize the sale of a new series of tax-exempt bonds,

3    known as refunding bonds, the proceeds of which would be used to discharge the original bond

4    issue to final maturity.

5        6.      The two most significant benefits of this financing program to the school districts

6    were: (1) the ability to provide the school districts with substantial cash-flow savings as a result

7    of semi-annual principal payments; and (2) the ability to provide the school districts with an

8    upfront cash payment equal to approximately one percent (1%) of the outstanding principal

9    amount of their original bond issue.

10       7.      As the investment banking firm involved in these financing programs, KND,

11   relying on unqualified legal opinions (explained more thoroughly below), underwrote the

12   refunding bonds, meaning KND purchased the refunding bonds from the school district and then

13   re-marketed such bonds to individual investors and to large institutional clients (which were often

14   individual investors).

15       8.      The proceeds from the sale of the refunding bonds were then used to purchase a

16   portfolio of United States Treasury Obligations ("United States Treasuries") for the purpose of

17   discharging the original bond issue to maturity.

18       9.      An escrow agent, appointed by the school districts, held the portfolio of United

19   States Treasuries in an escrow account and was responsible for receiving payments on the

20   maturing interest and principal of the United States Treasuries and using these proceeds to repay

21   the original tax-exempt bond obligations as scheduled.  Notably, maturing interest and principal

22   payments from the United States Treasuries seldom matched the repayment dates of principal and

23   interest on the original tax-exempt bond obligations.  The difference in timing of these dates, also

24   known in the industry as the "inefficiency," created the need to mitigate the inefficiency through

25   investment contracts that bridged the timing differences.  This type of arrangement between an

26   investment entity and the escrow agent was memorialized in an agreement known as an Escrow

27   Reinvestment Agreement.  In return for the right to reinvest the proceeds from the United States

28   Treasuries (until needed to pay debt service on the refunded tax-exempt bonds), the investment

1    entity paid the municipal issuer (the school district) an upfront one-time cash payment.

2         10.    Pursuant to a safe harbor provision of the Federal Tax Code, prior to awarding an

3    Escrow Reinvestment Agreement to an investment entity, it is required that the municipal issuer

4    receives bids from at least three independent investment entities interested in entering into the

5    Escrow Reinvestment Agreement with the escrow agent.  In order to comply with the Federal Tax

6    Code and to receive the requisite bids, the school districts using this refunding program hired

7    CDR to act as an independent broker.  Notably, the safe harbor provision prohibited CDR from

8    providing any bidding entity with a bidding advantage over other bidding entities, such as a "last

9    look."  As such, the safe harbor provision disallows an independent broker, such as CDR, from

10   receiving a fee or compensation (directly or indirectly) of any other type in excess of that amount

11   paid as represented by the certificate of the broker.

12        11.    Of the relevant twenty-four (24) school district financings that KND participated

13   in between 1993 and 2003, and for which CDR was the independent broker, Bank of America

14   won the right to enter into an Escrow Reinvestment Agreement with the escrow agent six (6)

15   times.

16        12.    After the winning bidder was determined, CDR was required to provide a

17   Certificate of Broker Regarding Bid of Escrow Float, which was attached as an exhibit to the No

18   Arbitrage and Tax Compliance Certificate executed by the District.  As part of the broker's

19   certificate, CDR certified that "[t]he Winning Bidder has not paid any brokers' fees or other

20   similar administrative costs in connection with the Float Contracts [Escrow Reinvestment

21   Agreements], other than a broker's fee of $10,000 (the "Broker's Fee") to Chambers, Dunhill,

22   Rubin & Co."  See, e.g., West Contra Costa Unified School District, 2001 General Obligation

23   Refunding Bonds, Series A, No Arbitrage and Tax Compliance Certificate, attached hereto as

24   Exhibit A.  CDR further certified that "no other compensation is being paid to us, directly or

25   indirectly, in consideration of our services as broker of the float contract [Escrow Reinvestment

26   Agreement]."  See id (emphasis added).   Pursuant to the certification provided by CDR, Bank of

27   America and CDR were aware that the only compensation CDR was to receive from Bank of

28   America for its services was the $10,000 Brokerage Fee.

WATT, TIEDER,
HOFFAR &
FITZGERALD, L.L.P.
ATTORNEYS AT LAW

- 4 -

COMPLAINT

Exhitbit 1
Page 8

13.     Additionally, Bank of America provided a Letter of Acceptance representing that Bank of America had not been provided "any information [from CDR] which induced us to bid a price higher than the price induced by the Request for Bids," and that "[t]he price bid was determined without regard to any other formal or informal agreement with the issuer or any other person (whether or not in connection with the above bond issue)."   See, e.g., Letter of Acceptance, West Contra Costa Unified School District, General Obligation Refunding Bonds, Series 2001A (Oct. 24, 2001), attached hereto as Exhibit B.  As part of this Letter of Acceptance, Bank of America (falsely) represented that it was not given a "last look," or any other bidding advantage, and that its bid price was not determined by any formal or informal agreements with CDR.  These documents, CDR's certification and Bank of America's Letter of Acceptance, were transmitted and sent to all interested parties, including KND, via U.S. mail and facsimile.

14.     Notably, contrary to the certification provided by CDR and the false representations of Bank of America in its Letter of Acceptance, Bank of America surreptitiously inserted a sentence into Section 6.10 (Broker's Fees) that provided that "the parties acknowledge that Provider [Bank of America] may also remit an additional fee to CDR at such time as the Provider exercises its right to deliver Substitute Securities as described in Section 2.04."  See, e.g., Escrow Reinvestment Agreement, West Contra Costa Unified School District, attached hereto as Exhibit C.  Such arrangements are not allowed within the safe harbor provisions of the tax code.  Furthermore, this language only appears in the six (6) Escrow Reinvestment Agreement programs underwritten by KND for which CDR was the independent broker and Bank of America was the winning bidder.  Among the Bank of America signatories to the Escrow Reinvestment Agreements was Douglas L. Campbell, a Senior Vice President at Bank of America at the time.

15.     In violation of both state and federal law, Bank of America paid CDR additional fees for services that CDR ultimately did not provide, in violation of both state and federal law.  Specifically, in return for a "last look" at the bids provided by the other bidding investment entities, Bank of America would provide an illegal kickback to CDR.

16.     Based in part on the Certificate of Broker Regarding Bid of Escrow Float provided

WATT, TIEDER,
HOFFAR &
FITZGERALD, L.L.P.
ATTORNEYS AT LAW

- 5 -

COMPLAINT

1   by CDR, and the representations from Bank of America that it had not received any type of

2   bidding advantage, KND provided a certification (the "underwriter's certificate") to bond counsel

3   for the school districts.  Relying on KND's certification, as well as the certifications of various

4   parties to the transaction (including those of CDR and Bank of America) and the IRS Tax Code

5   and its various safe harbor provisions, bond counsel for the school districts rendered its

6   unqualified opinion that the interest on the refunding bonds sold by KND was exempt from

7   federal income taxes.  Notably, it is the unqualified opinion of bond counsel that allowed the

8   bonds to be marketed and sold by KND as tax-exempt bonds.

9        17.     Had counsel for any of the non-conspiring interested parties, including counsel for

10   KND, known that Bank of America was paying CDR fees that were both in excess of the amount

11   CDR certified it was to receive as well as for services CDR was never going to provide (all as

12   part of a larger bid rigging practice more fully described below), KND would not have allowed

13   the Escrow Reinvestment Agreements with Bank of America to be executed.

14        18.     Additionally, had KND been aware that CDR's Certificate of Broker Regarding

15   Bid of Escrow Float was false (given that CDR was able to receive more than $10,000 from Bank

16   of America), KND would not have provided the underwriter's certificate.  On information and

17   belief, CDR made this certification with full knowledge that the statement that it only received

18   $10,000 from Bank of America for its services was false and inaccurate.

19        19.     From  1999 through early 2003, both the National Association of Securities

20   Dealers ("NASD") and the SEC (reportedly working in conjunction with the IRS) began

21   reviewing the tax-exempt status of the refunding bonds.  Notably, during these initial

22   investigations, KND was told that the refunding programs were being reviewed as a result of

23   CDR's involvement in these transactions.  After each review, however, KND was told that it was

24   permitted to continue the advance refunding program.

25        20.     In 2003, KND received notice that the issuance of tax-exempt refunding bonds by

26   the West Contra Costa Unified School District ("WCCUSD") pursuant to the advance refunding

27   program was under audit by the Internal Revenue Service ("IRS").  The purpose of the audit was

28   to review whether the applicable provisions of the Federal Tax Code were followed when the

WATT, TIEDER,
HOFFAR &
FITZGERALD, L.L.P.
ATTORNEYS AT LAW

- 6 -

COMPLAINT

Exhitbit 1
Page 10

1  refunding bonds were issued so as to allow the bonds to remain tax-exempt.

2        21.    To assist the IRS in understanding the intricacies of the advance refunding

3  program and to assure the IRS that the program complied with all legal and regulatory

4  requirements, KND met with Derek Knight, a Director Agent of the IRS.

5        22.    During the meeting with the IRS, Mr. Knight advised KND that the reason the

6  advance refunding programs were receiving such scrutiny was as a result of Bank of America's

7  and CDR's involvement in certain of those transactions.

8        23.    Recently, KND learned that beginning in the early 2000s, federal investigations

9  into bidding practices in the municipal derivatives market began.  Specifically, the investigations

10  focused on bid-rigging in the municipal guaranteed investment contract business throughout the

11  country, such as the Escrow Reinvestment Agreement.  At the heart of these investigations were

12  CDR and Bank of America.

13        24.    Stemming from these investigations, in early 2007, Bank of America entered into

14  an amnesty agreement with the U.S. Department of Justice, whereby in exchange for providing

15  information and fully cooperating with the Department of Justice, Bank of America would not be

16  prosecuted criminally for its participation in the national bid-rigging conspiracy.

17        25.    In February 2010, Daniel Naeh, a former employee of CDR, pled guilty to

18  conspiring to rig bids on investment contracts sold to local governments.  The following month,

19  in March 2010, Matthew Rothman and Douglas Goldberg, also former employees of CDR, pled

20  guilty to conspiring to rig bids on investment contracts sold to local governments throughout the

21  U.S.

22        26.    In September 2010, Douglas Lee Campbell, a former Bank of America corporate

23  executive, pled guilty to participating in a criminal conspiracy to rig the bids on investments sold

24  to municipal bond issuers.  Specifically, Mr. Campbell entered guilty pleas to fraud and

25  conspiracy.

26        27.    Recently, in December 2010, the Department of Justice announced that Bank of

27  America entered into agreements with the SEC, the IRS, the Office of the Comptroller of

28  Currency ("OCC"), and twenty (20) State Attorney Generals for payment of restitution to the IRS

1    and to municipalities harmed by Bank of America's anticompetitive conduct in the municipal

2    bond derivatives market.  Such (illegal) anticompetitive conduct included big rigging and other

3    deceptive practices.  See Department of Justice Release, Bank of America Agrees to Pay $137.3

4    Million in Restitution to Federal and State Agencies as a Condition of the Justice Department's

5    Antitrust Corporate Leniency Program (Dec. 7, 2010), attached hereto as Exhibit D.

6        28.    As a result of the negative media coverage from the investigation into the bid

7    rigging conspiracy between Bank of America and CDR, and the association of KND with these

8    two entities, KND lost a significant amount of business.  For example, KND lost financing

9    projects with Riverside County/Palm Desert Joint Power Authority, Oceanside Mobile Home

10   Park, Laguna Vista Multifamily Housing Authority, and the City of Stockton and was prohibited

11   from bidding on work with the City of Chula Vista, the Orange County School District, the City

12   of San Marcos, and the San Marcos School District.

13       29.    Specifically, with respect to the financing projects with Riverside County/Palm

14   Desert Joint Power Authority, Oceanside Mobile Home Park, Laguna Vista Multifamily Housing

15   Authority, and City of Stockton, KND was initially hired to underwrite bonds for these projects

16   and was subsequently fired as a result of KND's (innocent) association with Bank of America and

17   CDR.

18       30.    Additionally, in the secondary bond market, many of the bonds underwritten by

19   KND sold in the market place as "Kinsell" bonds.  As a result of the IRS scrutiny, these "Kinsell"

20   bonds sold at a significant discount, and this competitive disadvantage adversely affected KND's

21   ability to market bonds on any deal.

22       31.    The damages to KND's business and reputation were compounded by the

23   potential threat of litigation by a number of school districts and bondholders as a result of the IRS

24   investigation.

25       32.    As a result of the IRS investigations into a number of  these advance refunding

26   programs – prompted by Bank of America's and CDR's involvement in some of these

27   transactions – on July 24, 2008, KND agreed to pay the IRS $5 million (after tax dollars) in order

28   to allow the refunding bonds to remain tax-exempt.  This settlement was made on behalf of all

WATT, TIEDER,
HOFFAR &
FITZGERALD, L.L.P.
ATTORNEYS AT LAW

- 8 -

COMPLAINT

Exhitbit 1
Page 12

1   interested parties to the bond transactions, including, but not limited to, the school districts, their

2   respective consultants, counsel and thousands of bond investors.  As part of this agreement, KND

3   did not admit to any wrong doing.

4                           **(Fraud – Against Bank of America and CDR)**

5         33.     KND realleges and incorporates by reference the allegations of the preceding

6   paragraphs above as if fully set forth herein.

7         34.     Upon presentation of the Certificate of Broker Regarding Bid of Escrow Float,

8   CDR intentionally misrepresented to KND, as well as all other interested parties to the

9   transaction, that Bank of America only paid CDR a $10,000 broker's fee in connection with its

10   brokerage services.  Additionally, Bank of America also represented to KND that it had not

11   received a "last look" or entered into any formal or informal agreements regarding the price bid.

12   This false misrepresentation was made by Bank of America to KND when Bank of America

13   provided its Letter of Acceptance.

14         35.     The representations made by CDR (through its certification) and Bank of America

15   (through its Letter of Acceptance) were materially false.  Specifically, both Bank of America and

16   CDR knew that the inclusion of the last sentence of Section 6.10 of the Escrow Reinvestment

17   Agreement allowed CDR to obtain additional fees beyond the $10,000 brokerage fee and, as such,

18   CDR, through its certification, and Bank of America, through its Letter of Acceptance, knowingly

19   and intentionally misrepresented that CDR only received $10,000 from Bank of America.  Bank

20   of America also knew that its Letter of Acceptance was false, given that CDR provided Bank of

21   America with a "last look," which allowed Bank of America to win the float contract, in

22   exchange for an (illegal) kickback to CDR.

23         36.     CDR, through its Certificate of Broker Regarding Bid of Escrow Float, and Bank

24   of America, through its Letter of Acceptance, intended that KND and all other non-conspiring

25   interested parties, would rely on these representations when providing certificates to bond counsel

26   and, in turn, bond counsel would rely on these certifications when rendering their unqualified

27   opinion that the refunding bonds were tax-exempt.

28

WATT, TIEDER,
HOFFAR &
FITZGERALD, L.L.P.
ATTORNEYS AT LAW

- 9 -

COMPLAINT

Exhibit 1
Page 13

37.     As is standard practice in the bond investment industry, KND reasonably relied on CDR's certifications and Bank of America's (false) representations when making its certification to bond counsel.  Bond counsel, in turn, reasonably relied on KND's certification in rendering its legal opinion that the transaction complied with all legal and regulatory requirements.

38.     As a result of Bank of America's and CDR's false representations, KND, as well as all other interested parties in the transaction, approved of the signing of the execution copy of the Escrow Reinvestment Agreement provided by Bank of America and KND provided its certification to bond counsel in order to allow bond counsel to provide its unqualified opinion that the bonds were tax-exempt.

39.     Had KND known of  CDR's false certification and Bank of America's false representations, KND would not have permitted the Escrow Reinvestment Agreement to be signed and KND would not have provided its underwriter's certificate to bond counsel or to underwrite the bonds.

40.     As a result of the illegal provision, fraudulently inserted into the Escrow Reinvestment Agreement by Bank of America, and CDR's and Bank of America's false representations, KND's innocent association with Bank of America and CDR led the IRS to conduct several investigations into these advance refunding programs.  The media coverage of these investigations resulted in a substantial loss of business to KND.  Additionally, in order to preserve the tax-exempt status of the forward refunding bonds, on July 24, 2008, KND agreed to a $5,000,000.00 settlement with the IRS.

41.     As a direct result of Bank of America's and CDR's fraudulent conduct, KND has suffered damages in an amount to be proven at trial, but are in excess of $15,000,000.00.

## SECOND CAUSE OF ACTION

### (Fraudulent Concealment – Against Bank of America and CDR)

42.     KND realleges and incorporates by reference the allegations of the preceding paragraphs as if fully set forth herein.

43.     Upon providing its Letter of Acceptance to KND that it was not given a last look and that its bid price was not based on any formal or informal agreements with any party to the

Exhibit 1
Page 14

1   transaction, Bank of America purposefully concealed that CDR provided Bank of America with

2   an (illegal) "last look" and that the Escrow Reinvestment Agreement contained a provision that

3   provided for additional (illegal) fees to be paid to CDR.  CDR knowingly concealed the effect of

4   this additional provision of the Escrow Reinvestment Agreement – that it would receive

5   additional (illegal) fees – by falsely certifying that it only received $10,000 in fees from Bank of

6   America.

7           44.     The Defendant, Bank of America, as a party to the Escrow Reinvestment

8   Agreements, was under a duty to disclose the effect of this provision to both KND and all other

9   parties interested in the transaction.  CDR, through its Certificate of Broker Regarding Bid of

10  Escrow Float, was required to disclose any fees it was going to receive from Bank of America,

11  including the fees contemplated by the last sentence of Section 6.10 of the Escrow Reinvestment

12  Agreement.

13          45.     Bank of America, aware that the last sentence of Section 6.10 of the Escrow

14  Reinvestment Agreement allowed for an illegal kickback to CDR, intentionally concealed its

15  inclusion and effect in the execution copy of the Escrow Reinvestment Agreement.  Similarly,

16  CDR intentionally concealed (through its certification) that it was to receive additional fees as a

17  result of the addition of this provision.

18          46.     Had KND been aware of the effect of this illegal kick-back provision, and CDR's

19  false certification, KND would not have allowed the Escrow Reinvestment Agreement to be

20  signed with this provision included in the agreement and KND would not have certified to bond

21  counsel that various pricing and bidding rules, and yield computations were made in compliance

22  with federal tax law requirements for tax-exempt bonds.

23          47.     As a result of a federal investigation into illegal bid rigging practices in the

24  municipal bond market, of which CDR and Bank of America were at the heart of, KND through

25  its innocent association with these two entities received significant negative media attention.  This

26  led to KND losing a number of existing and potential investment clients, including, but not

27  limited to, Riverside County/Palm Desert Joint Power Authority, Oceanside Mobile Home Park,

28  Laguna Vista Multifamily Housing Authority, and the City of Stockton.  Additionally, in order to

WATT, TIEDER,
HOFFAR &
FITZGERALD, L.L.P.
ATTORNEYS AT LAW

- 11 -

COMPLAINT

Exhibit 1
Page 15

1   preserve the tax-exempt status of the forward refunding bonds, KND agreed to a $5,000,000.00

2   settlement with the IRS.

3        48.    As a direct result of Bank of America's and CDR's fraudulent concealment of

4   material facts, KND has suffered damages in an amount to be proven at trial, but are in excess of

5   $15,000,000.00.

6                              **THIRD CAUSE OF ACTION**

7        **(Tortious Interference with Economic Advantage – Against Bank of America and CDR)**

8        49.    KND realleges and incorporates by reference the allegations of the preceding

9   paragraphs as if fully set forth herein.

10       50.    Plaintiff had an economic relationship with the following entities: (a) Riverside

11  County/Palm Desert Joint Powers Authority; (b) Oceanside Mobile Home Park; (c) Laguna Vista

12  Multifamily Housing Authority; and (d) the City of Stockton.  There was a reasonable probability

13  of future economic benefit to KND as a result of KND's economic relationship with each of the

14  foregoing entities.  Specifically, KND had a legitimate expectancy that – but for Bank of

15  America's and CDR's bid-rigging conspiracy and the subsequent negative media attention –

16  KND would have entered into agreements to create financing programs with (a) Riverside

17  County/Palm Desert Joint Powers Authority; (b) Oceanside Mobile Home Park; (c) Laguna Vista

18  Multifamily Housing Authority; and (d) the City of Stockton.  The probability that KND would

19  have entered into agreements to create financing programs with Riverside County/Palm Desert

20  Joint Powers Authority, Oceanside Mobile Home Park, Laguna Vista Multifamily Housing

21  Authoirty, and the City of Stockton is reinforced by the fact that KND had been hired by each of

22  the foregoing entities to participate in these various financing programs and was subsequently

23  fired as a result of the negative media attention from Bank of America's and CDR's bid-rigging

24  conspiracy, and KND's innocent association with the Defendants.

25       51.    Bank of America and CDR were aware of these economic relationships inasmuch

26  as both Bank of America and CDR were aware that a false certification would call into question

27  the tax-exempt status of the bonds, which in turn would have immediate and harmful results to

28  KND's potential and existing economic relationships.

WATT, TIEDER,
HOFFAR &
FITZGERALD, L.L.P.
ATTORNEYS AT LAW

- 12 -

COMPLAINT

Exhibit 1
Page 16

52.     Bank of America and CDR intentionally interfered with these economic relationships inasmuch as the Defendants knew that their illegal bid-rigging conspiracy and fraud, if discovered, was certain or substantially certain to result in interference with KND's economic relationships.

53.     In the absence of Bank of America's and CDR's intentional and illegal misconduct (which was independently wrongful), KND would have realized revenues derived from its economic relationships with Riverside County/Palm Desert Joint Powers Authority, Oceanside Mobile Home Park, Laguna Vista Multifamily Housing Authority, and the City of Stockton.

54.     As a direct and proximate result of Bank of America's intentional and concerted misconduct, KND has suffered damages in an amount to be proven at trial, but are in excess of $ 15,000,000.00.

## FOURTH CAUSE OF ACTION

### (Negligent Interference with Economic Advantage – Against Bank of America and CDR)

55.     KND realleges and incorporates by reference the allegations of the preceding paragraphs as if fully set forth herein.

56.     Plaintiff had an economic relationship with the following entities: (a) Riverside County/Palm Desert Joint Powers Authority; (b) Oceanside Mobile Home Park; (c) Laguna Vista Multifamily Housing Authority; and (d) the City of Stockton.  There was a reasonable probability of future economic benefit to KND as a result of KND's economic relationship with each of the foregoing entities.  Specifically, KND had a legitimate expectancy that – but for Bank of America's and CDR's bid-rigging conspiracy and the subsequent negative media attention – KND would have entered into agreements to create financing programs with (a) Riverside County/Palm Desert Joint Powers Authority; (b) Oceanside Mobile Home Park; (c) Laguna Vista Multifamily Housing Authority; and (d) the City of Stockton.  The probability that KND would have entered into agreements to create financing programs with Riverside County/Palm Desert Joint Powers Authority, Oceanside Mobile Home Park, Laguna Vista Multifamily Housing Authority, and the City of Stockton is reinforced by the fact that KND had been hired by each of the foregoing entities to participate in these various financing programs and was subsequently

- 13 -

WATT, TIEDER, HOFFAR & FITZGERALD, L.L.P.
ATTORNEYS AT LAW

Exhibit 1
Page 17

1    fired as a result of the negative media attention from Bank of America's and CDR's bid-rigging

2    conspiracy, and KND's innocent association with the Defendants.

3        57.    Bank of America and CDR were aware of these economic relationships inasmuch

4    as both Bank of America and CDR were aware that a false certification would call into question

5    the tax-exempt status of the bonds, which in turn would have immediate and harmful results to

6    KND's potential and existing economic relationships.

7        58.    Bank of America and CDR were aware that if they did not act with due care in

8    drafting the Escrow Reinvestment Agreement and certifying the fees received by CDR that their

9    actions would interfere with KND's economic relationships with Riverside County/Palm Desert

10   Joint Powers Authority, Oceanside Mobile Home Park, Laguna Vista Multifamily Housing

11   Authority, and the City of Stockton and would cause KND to lose the probability of future

12   economic benefit or advantage with the foregoing entities.  Specifically, Bank of America and

13   CDR knew that their bid-rigging conspiracy, as manifested in Section 6.10 of the Escrow

14   Reinvestment Agreements and CDR's certification would interfere with KND's economic

15   relationships with Riverside County/Palm Desert Joint Powers Authority, Oceanside Mobile

16   Home Park, Laguna Vista Multifamily Housing Authority, and the City of Stockton.

17       59.    Defendants Bank of America and CDR did not exercise due care and were

18   negligent.  Additionally, recognizing the wrongfulness of Bank of America's and CDR's conduct

19   as it relates to bidding practices in the municipal bond market, senior employees of both Bank of

20   America and CDR have pled guilty to conspiracy and fraud.

21       60.    In the absence of Bank of America's and CDR's negligent and illegal misconduct

22   (which was independently wrongful), KND would have realized revenues derived from its

23   economic relationships with Riverside County/Palm Desert Joint Powers Authority, Oceanside

24   Mobile Home Park, Laguna Vista Multifamily Housing Authority, and the City of Stockton.

25       61.    As a direct result of Bank of America's and CDR's negligence, KND has suffered

26   damages in an amount to be proven at trial, but which are in excess of $ 15,000,000.00.

27

28

WATT, TIEDER,
HOFFAR &
FITZGERALD, L.L.P.
ATTORNEYS AT LAW

- 14 -

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**FIFTH CAUSE OF ACTION**

**(RICO Violation – Against Bank of America and CDR)**

62.     KND realleges and incorporates by reference the allegations of the preceding paragraphs as if fully set forth herein.

63.     To perpetrate their nationwide bid-rigging conspiracy, and to defraud KND, Bank of America and CDR formed an association-in-fact enterprise (the "Bank of America/CDR Bid-rigging Enterprise"), as defined by 18 U.S.C. § 1961(4), whose purpose was to illegally rig bids in the municipal bond market by improperly allowing Bank of American a "last look" at other investment entities' bids in exchange for an illegal kickback to CDR.

64.     Both Bank of America and CDR had control over and participated in the operation and management of the Bank of America/CDR Bid-rigging Enterprise inasmuch as both parties were active participants in and controlled the bid-rigging conspiracy and scheme to defraud KND.

65.     The Bank of America/CDR Bid-rigging Enterprise accomplished its bid-rigging conspiracy and scheme to defraud KND through a pattern of racketeering activity as defined by 18 U.S.C. § 1961(1).  Specifically, the Bank of America/CDR Bid-rigging Enterprise devised a scheme to defraud KND, as well as other parties involved in the school refunding programs, by falsely representing to KND (and other interested parties) that, with respect to its bid for the Escrow Reinvestment Agreement, Bank of America did not receive any bidding advantage and had not entered into any formal or informal agreements regarding the bid price and that CDR only received $10,000 for its brokerage services.  These false representations were made by Bank of America by way of its Letter of Acceptance and by CDR by way of its Certificate of Broker Regarding Bid of Escrow Float.  Both of these documents, in each of the six (6) transactions that Bank of America was involved in, were transmitted to KND (and other interested parties) via the U.S. mail system and via wire (facsimile).  Bank of America and CDR, as part of their bid-rigging enterprise, transmitted the Letter of Acceptance and Certificate of Broker Regarding Bid of Escrow Float, via the U.S. mail and facsimile, with the specific intent that KND would rely on the (false) representations made in these documents when providing its certificate to bond counsel.  Bond counsel in turn relied on KND's certification, as well as Bank of America and CDR's

WATT, TIEDER,
HOFFAR &
FITZGERALD, L.L.P.
ATTORNEYS AT LAW

COMPLAINT

1  (false) representations, when rendering their unqualified opinion that the refunding bonds were

2  tax-exempt.

3        66.  The Bank of America/CDR Bid-rigging Enterprise formed a scheme to defraud

4  KND (through the use of the U.S. mail system and via wire) on six (6) occasions. This scheme to

5  defraud KND was part of a larger, nationwide bid-rigging conspiracy in the municipal bond

6  market (that undoubtedly affected interstate commerce) for which employees of both Bank of

7  America and CDR have pled guilty.

8        67.  As a direct and proximate result of the Bank of America/CDR Bid-rigging

9  Enterprise's pattern of racketeering activity – specifically, through the use of the U.S. mail system

10  and wire to defraud KND – KND's business has been injured inasmuch as KND has suffered

11  damages in an amount to be proven at trial, but which are in excess of $ 15,000,000.00.

12  **PRAYER FOR RELIEF**

13      WHEREFORE, Plaintiff KINSELL, NEWCOMB & DE DIOS, INC. prays for the

14  following relief:

15  **ON THE FIRST CAUSE OF ACTION**

16      1.  For compensatory, incidental, consequential, punitive, and other damages in an

17  amount according to proof but not less than $15,000,000;

18      2.  For applicable prejudgment interest; and

19      3.  For such other and further relief as the court deems just and proper.

20  **ON THE SECOND CAUSE OF ACTION**

21      1.  For compensatory, incidental, consequential, punitive, and other damages in an

22  amount according to proof but not less than $15,000,000;

23      2.  For applicable prejudgment interest; and

24      3.  For such other and further relief as the court deems just and proper.

25  **ON THE THIRD CAUSE OF ACTION**

26      1.  For compensatory, incidental, consequential, and other damages in an amount

27  according to proof but not less than $15,000,000;

28      2.  For applicable prejudgment interest; and

WATT, TIEDER,
HOFFAR &
FITZGERALD, L.L.P.
ATTORNEYS AT LAW

- 16 -

COMPLAINT

Exhibit 1
Page 20

1       3.      For such other and further relief as the court deems just and proper.

2                 **ON THE FOURTH CAUSE OF ACTION**

3       1.      For compensatory, incidental, consequential, and other damages in an amount

4  according to proof but not less than $15,000,000;

5       2.      For applicable prejudgment interest; and

6       3.      For such other and further relief as the court deems just and proper.

7                 **ON THE FIFTH CAUSE OF ACTION**

8       1.      For compensatory damages, of such damages pursuant to 18 U.S.C. § 1964,  in an

9  amount according to proof but not less than $15,000,000, and the trebling of such damages to an

10  amount not less than $45,000,000.00;

11      2.      For legal costs and attorneys' fees;

12      3.      For applicable prejudgment interest; and

13      4.      For such other and further relief as the court deems just and proper.

14  Dated: January _____, 2011          Watt, Tieder, Hoffar & Fitzgerald, L.L.P.

15

16

17                      By:_____
                           Mark A. Sgarlata

18                         Alexander N. Lamme
                         David E. Nemeth, Jr.

19                         Attorneys for Plaintiff
                         Kinsell, Newcomb & De Dios, Inc.

20

21

22

23

24

25

26

27

28

1

## VERIFICATION TO COMPLAINT

2      I, J. Jeffery Kinsell, am the Executive Vice-President of Kinsell, Newcomb & De Dios,

3  Inc., the plaintiff in the above-captioned action, and I am authorized to make this Verification for

4  and on its behalf.   I have read the above-captioned complaint and know its contents.   I am

5  informed and believe and on that ground allege that the matters stated therein are true.

6      I declare under penalty of perjury under the laws of the State of California that the

7  foregoing is true and correct.

8      Executed on _____, 2011, at _____, California.

9

10

11

12                                              _____
                                            J. Jeffery Kinsell

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WATT, TIEDER,
HOFFAR &
FITZGERALD, L.L.P.
ATTORNEYS AT LAW

- 18 -

COMPLAINT

Exhitbit 1
Page 22